UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| JOHN B. LOWERY, | ) |
| Petitioner, | ) ) ) |
| v. | ) No.: 3:18-CV-330-CLC-HBG ) |
| MIKE PARRIS, | ) ) |
| Respondent. | ) ) |

## MEMORANDUM OPINION

This pro se prisoner's federal habeas action arising under 28 U.S.C. § 2254 is before the Court on remand from the Sixth Circuit for a determination of whether Petitioner has established a claim of actual innocence to allow review of his untimely petition [*See* Doc. 23]. The parties have briefed the issue [*See* Docs. 30, 31, and 33]. Having considered the submissions of the parties, the record of proceedings, and the law applicable to Petitioner's claims, the Court finds that Petitioner is not entitled to avail himself of the actual-innocence exception to § 2254's one-year statute of limitations, and that the petition is time barred. *See* 28 U.S.C. § 2244(d).

**I.      PROCEDURAL HISTORY**

Petitioner was convicted of one count of premeditated first-degree murder and one count of attempted first-degree murder by a Knox County jury and was sentenced to consecutive terms of life imprisonment for murder and twenty-five years for attempted murder. *State v. Lowery*, No. E1998-0034-CCA-R3-CD, 2000 WL 748103, at *1 (Tenn. Crim. App. June 12, 2000), *perm. app. denied* (Tenn. Feb. 20, 2001). The Tennessee Court of Criminal Appeals ("TCCA") affirmed Petitioner's conviction and sentence on June 12, 2000. *Id.* On February 20, 2001, the Tennessee Supreme Court denied discretionary review. *Id.* Petitioner never filed a post-conviction petition.

On September 14, 2011, more than a decade later, Petitioner filed a petition for writ of error coram nobis, ultimately producing affidavits from three witnesses: two eyewitnesses who recanted their trial identification of Petitioner as the gunman, and a store cashier who swore Petitioner was not in the store the day of the shooting [Doc. 6-11 at 5–25; 35–42]. The petition was summarily denied by the trial court [*Id*. at 63–64]. Petitioner appealed, and the TCCA remanded for an evidentiary hearing. *Lowery v. State*, No. E2012-01613-CCA-R3-PC, 2013 WL 4767188, at *1 (Tenn. Crim. App. Sept. 4, 2013). Following an evidentiary hearing, the coram nobis court denied relief, and on appeal, the TCCA affirmed that denial. *State v. Lowery*, E2016-00587-CCA-R3-CD, 2017 WL 3078313, at *1 (Tenn. Crim. App. July 19, 2017), *perm. app. denied* (Tenn. Nov. 16, 2017). On November 16, 2017, the Tennessee Supreme Court denied discretionary review. *Id*.

Thereafter, on or about August 10, 2018, Petitioner submitted a pro se petition for writ of habeas corpus [Doc. 1]. In response to the Court's subsequent order for Respondent to answer or otherwise respond to the motion, Respondent filed a motion to dismiss the action as time barred [Docs. 5 and 7]. This Court granted Respondent's motion and held that the affidavits presented by Petitioner did not constitute "new" evidence because the same affidavits were already presented and addressed by the state court [Doc. 11 at 5–6].

Petitioner appealed, and the Court of Appeals for the Sixth Circuit held that this Court "erred by concluding that evidence presented to state courts categorically does not qualify" as new evidence [Doc. 23 at 3]. The Sixth Circuit went on to say:

> That's not to say that the three affidavits *do* qualify as new evidence. Maybe they do, maybe they don't. We leave that to the district court to decide in the first instance. All we decide today is that the district court erred by finding that the evidence wasn't new simply because it was originally presented in state court during the coram nobis proceedings.

2

[*Id*. at 4]. Consequently, the Sixth Circuit vacated this Court's decision and remanded the case for further proceedings [*Id*.]

On remand, this Court ordered briefing on "whether the three affidavits constitute 'new evidence' that would vitiate the limitations bar" [Doc. 26]. Petitioner's initial brief was filed January 13, 2021 [Doc. 31], Respondent filed his brief on February 9, 2021[Doc. 32], and Petitioner submitted a reply brief on March 22, 2021 [Doc. 33].

## II. RELEVANT FACTUAL BACKGROUND

Petitioner was robbed at gunpoint in the early morning hours of October 8, 1996 by three young black males wearing masks [Doc. 6-1 at 33–34]. The robbers took his belongings, forced him into his car, and ultimately drove him to a remote location and dropped him off [*Id*. at 34]. Petitioner made his way to his uncle's home and called the police [*Id*. at 37]. Around 3:30 a.m., Petitioner made a report of the robbery to Officer Gerald Thomas George II, telling the officer that he was unable to identify the robbers [*Id*. 34–36].

A few hours later, eighteen-year-old William Boatwright, accompanied by his sixteen-year-old cousin Darrell Hartsell, drove to Kirk's Market to buy food items [*Id*. at 40–41]. Hartsell remained in the vehicle while Boatwright went inside and made his purchases [*Id*. at 41–42]. While he was in the store, Boatwright saw "a guy . . . that kind of looked familiar" walk in and then walk back out [*Id*. at 42]. At trial, Boatwright identified that "guy" as Petitioner [*Id*.]. After Boatwright purchased his items, he went outside and was called to the side of the building by Jay Harris [*Id*. at 42]. After speaking with Harris for a few seconds, Boatwright heard a gunshot [*Id*. at 42–43]. He then saw Petitioner running toward him with a handgun [*Id*. at 43]. Boatwright attempted to re-enter the store and was shot in the chest just as he was going inside [*Id*.]. Boatwright made it into the store and crawled behind the counter [*Id*. at 43]. Petitioner started to enter the store but instead fled when the cashier began screaming [*Id*.]. Boatwright remained in

3

the store for several minutes before going outside to check on Hartsell, who had been shot in the neck while waiting in the passenger's seat of the car [*Id*. at 45].

Malik Hardin, a friend of Boatwright's, had been in Kirk's Market just prior to the shooting and saw Boatwright arguing with someone he later identified as Petitioner [*Id*. at 67, 71]. Hardin left the store and was backing his car out of the store's parking lot when he saw Hartsell get shot [*Id*. at 67]. Hardin pulled back into the parking lot, and Boatwright ran outside of the store, jumped into Hardin's car, and drove away [*Id*. at 46, 61-63]. Boatwright was apparently found unconscious by his aunt at her front door and was subsequently transported by ambulance to the hospital [*Id*. at 46]. Meanwhile, at Kirk's Market, Hardin stayed with Hartsell until an ambulance arrived [*Id*. at 69].

James Bowman, an acquaintance of Petitioner's brother, Fred Lowery, was present at Kirk's Market just prior to the shooting and gave a statement to police at 9:50 a.m. that morning [*Id*. at 105]. Bowman informed officers that he drove his stepdaughter to the market a little after 6:30 a.m. so she could purchase a drink before school [*Id*. at 91]. While his stepdaughter was inside the store, Petitioner got into Bowman's car and told Bowman he had been robbed earlier that morning [*Id*. at 91–92]. A car then pulled up, and Petitioner indicated that the men who robbed him were in that car [*Id*. at 96–106]. Petitioner then got out of Bowman's car and told his brother, Fred Lowery, and his cousin, Jay Harris, "[t]hat's it boys, right here" [*Id.* at 105]. Bowman stated that the men then "surrounded the building" [*Id*.]. Bowman asked if he could get his little girl out of the way before "stuff starts" [*Id*. at 106]. Bowman left with his stepdaughter and dropped her at the bus stop [*Id.* at 105–06]. At trial, Bowman was reluctant to definitively identify Petitioner as the person who got into his car, stating that Petitioner's brother Fred looks "just like him" [*Id*. at 107].

4

The shooting was reported to the Knox County Police Department around 6:40 a.m. [*Id*. at 23]. Hartsell underwent surgery but died the following day [*Id*. at 130-31]. Forensics performed on the shell casings at the scene revealed that the shots were fired from the same .45 caliber weapon [*Id*. at 115].

Detective David Ridenour, at the time a Major Crimes Investigator for the Knoxville Police Department, was notified of the shooting [Doc. 6-2 at 57–58]. He went to the hospital to interview the victims [*Id*. at 60]. At trial, Ridenour testified that Boatwright initially identified the shooter as "J.B." [*Id*. at 60, 62–63]. Ridenour testified that once Boatwright told him that the shooter was "J.B.," he reviewed the reports from that day and found the robbery report from Petitioner [*Id*. at 62–63]. Based on that, he thought the robbery victim might also be the shooter given the area's penchant for drug-related robberies and retaliatory acts [*Id*.]. He put together a photo lineup with Petitioner's photograph and took the lineup to remaining interviews [*Id*. at 63].

Hardin, an eyewitness to the shooting, identified Petitioner as the person he saw pointing the gun at Hartsell [*Id*. at 59-60]. Bowman identified Petitioner as the individual who got into his car earlier that day to tell him about a robbery [*Id*. at 59]. Boatwright also identified Petitioner as the shooter from the photo lineup but testified at trial that he did not identify Petitioner as the shooter until the police showed him the photo lineup [Doc. 6-2 at 60–61; Doc. 6-1 at 59].

Mary Santos, a previous romantic partner to Petitioner's uncle, Walter Lowery, testified that Walter hired Petitioner and Hartsell to sell drugs for him [Doc. 6-1 at 117–18]. She stated that in the summer of 1996, Petitioner and Walter were angry with Hartsell over a botched drug sale [*Id*. at 121–23]. Santos further testified that she had heard Petitioner state on several occasions that he would kill Hartsell in retaliation [*Id*. at 124]. On cross-examination, Santos admitted that she had been in an ongoing custody battle with Walter over their two children since September 1996 [*Id*. at 125–26].

5

Petitioner presented five witnesses at trial, three of whom were at the market at the time of the shooting. Fred Lowery, Greg Moore, and Jay Harris each testified that they did not see the person who shot Boatwright and Hartsell, but that Petitioner was not present at the time of the shooting [Doc. 6-2 at 25–26; 33; 43–44]. A fourth witness, Tamera McMillan, testified that she was Petitioner's neighbor, and that he was at her apartment at the time of the shooting [*Id*. at 48–49]. After deliberating for fifty-one minutes, the jury returned a verdict of guilty on both the murder and attempted murder counts [Doc. 6-3 at 43, 45].

More than a decade later, in an affidavit sworn September 16, 2010, Hardin recanted his identification of Petitioner as the gunman [*See, e.g*., Doc. 2-1 at 3–4]. At the subsequent coram nobis hearing, Hardin testified that when he arrived at the store on the morning of the shooting, he saw Boatwright and Hartsell inside arguing with "a couple other guys" [Doc. 6-16 at 41]. Hardin claimed he made sure everything was okay between the men and returned to his car [*Id*. at 41–42]. Hardin stated that, as he was backing out, he saw a man in motion with his back to Hardin [*Id*. at 42]. The man turned, and Hardin saw a gun in the man's hand [*Id*. at 42]. Hardin, who stated he had his music up too loud to hear anything, saw the man open the door to the store and reach inside before he ran away in front of Hardin's car [*Id*. at 42–43]. Hardin pulled back into the parking lot and found Hartsell hanging out of a car bleeding from the neck [*Id*. at 43–44]. Hardin maintained that Boatwright then exited the store, took Hardin's keys, and drove away [*Id*. at 44]. Hardin stated he remained with Hartsell until the ambulance arrived [*Id*.]. Hardin alleged that when police arrived, he told them he did not know the identity of the shooter, but police repeatedly told him that he either committed the crime or knew who did [*Id*.]. Hardin, who was sixteen years old at the time and out on bond, claimed that he feared the police would charge him with the crime [Doc. 6-16 at 44–46; Doc. 2-1 at 4]. For that reason, he testified, when police showed him a six-photo lineup and pointed to a specific photo before asking him if that individual was the shooter, he

6

stated that the person in the photo "kind of resembled" the shooter [Doc. 6-16 at 44–47]. He stated however, that once he saw Petitioner "close up" at the Morgan County Correctional Complex ("MCCX"), he was one hundred percent certain Petitioner was not the gunman [*Id*. at 47].

On cross-examination, Hardin acknowledged that an inmate who worked in the law library had drafted the affidavit on Petitioner's behalf and brought it to Hardin to sign, which Hardin did after making a few factual changes that he could not recall [*Id*. at 50–51]. Hardin indicated that he was incarcerated with most of a fifteen-year sentence left to serve [*Id*. at 51–52]. He conceded that "snitches" tend to get assaulted by other prisoners, especially in state prison [*Id*. at 52–53]. Hardin admitted that police never threatened to charge him with anything if he did not identify Petitioner as the shooter [*Id*. at 55–56]. He also conceded that, at the time of Petitioner's trial, he knew he would not be charged with anything relating to the shooting at Kirk's Market but still identified Petitioner as the shooter [*Id*. at 59]. Hardin agreed that, at the time of the shooting, he was upset by the murder of his friend and wanted to help the police apprehend the gunman by providing accurate information [*Id*. at 63–64].

In April 2012, Boatwright, the surviving victim, also recanted his identification of Petitioner as the gunman [*See, e.g.*, Doc. 2-1 at 6]. At the coram nobis hearing, Boatwright testified that he saw Hartsell with a gunshot wound right before he was also shot [Doc. 6-16 at 9]. He stated he ran back into the store and the cashier began screaming [*Id*.]. Boatwright then reemerged from the store, sighting Hardin [*Id*.]. Boatwright checked on Hartsell and then drove to "the projects" where he "fell out" [*Id*.]. He later "woke up in the hospital" [*Id*.]. Boatwright testified that he did not see the person who shot him and Hartsell and was unable to identify anyone in the photo lineup presented to him by police [*Id*. at 10]. Boatwright contended that he identified Petitioner when the police showed him the lineup for a second time only because the police threatened to charge him with robbery and murder, and the officers "kept pointing at [Petitioner's] picture" [*Id*. at 11–12].

7

Boatwright stated that he did not know Petitioner at the time of the murder, and that he felt forced to testify that Petitioner was the man who shot him in order to avoid being charged with murder or robbery [*Id*. at 11].

On cross-examination, Boatwright acknowledged that he had served approximately five years of a forty-nine-year sentence for especially aggravated robbery, aggravated robbery, and burglary, and that he and Petitioner were both incarcerated at MCCX [*Id*. at 16–18]. Boatwright contested a police report purportedly indicating that a detective spoke with him in the hospital approximately thirty minutes after the shooting where Boatwright identified the gunman as a man named "J.B." [*Id*. at 20–21]. When Boatwright was asked to explain how he believed he could be charged with the murder of Hartsell when witnesses saw him exiting the store, and when he himself was a victim, Boatwright stated that he did not know [*Id*. at 23]. Boatwright denied concerns of being labeled a "snitch" and maintained that everything he said at trial was fabricated to avoid being charged with murder and/or the robbery of Petitioner [*Id*. at 16, 23, 39].

On September 7, 2011, Loretta Turner, the cashier at Kirk's Market on the day of the shooting, signed an affidavit stating that Petitioner was not in the store the morning of the shooting, and that she had told a police officer that fact when she was interviewed the day of the shooting [Doc. 2-1 at 5]. She testified at the coram nobis hearing that she knew Petitioner because he had dated her niece, and she met him once prior to the shooting [Doc. 6-16 at 67–68]. Turner stated that on October 8, 1996, seven or eight "young people" entered the store at approximately 5:45 a.m., and that she was nervous because she thought they might rob her [*Id*. at 66]. Turner stated that when they approached the counter to pay, "they started fussing among themselves" [*Id*.]. Turner maintained that she asked the individuals "not to," and one of the males "chewed [her] out" before leaving the store [*Id*. at 66]. Turner then heard gunshots, ducked behind the solid wooden counter, and did not see the shooter [*Id*. at 66, 72–73]. She stated that when Boatwright came back

8

into the store and fell down, she ran to lock the door and pulled him around the counter with her [*Id*. at 67]. She did not see the shooter when she locked the door and noted that it was dark outside at the time [*Id*. at 73].

At the conclusion of proof, the coram nobis court denied Petitioner relief [Doc. 6-15 at 61–63]. The court failed to find Hardin and Boatwright's testimony credible, maintaining that they were "vague and inconsistent in their testimony" [*Id*. at 62–63]. It found Turner's testimony seemingly truthful but noted "she was ducking and hiding" at the time of the shootings [*Id*. at 62]. It also noted that her testimony was cumulative of the other witnesses who testified at trial that Petitioner was not present at Kirk's Market the day of the shooting [*Id*. at 62–63]. The coram nobis court concluded that it did "not find that the cumulative evidence of Loretta Turner may have caused the jury to reach a different result." [*Id*.].

### III. GOVERNING LAW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which subjects habeas petitions challenging state-court judgments to the one-year statute of limitations set forth in 28 U.S.C. § 2244. *See* 28 U.S.C. § 2244(d)(1) (subjecting habeas petitioners in custody under state-court judgment to file petitions within one year of various triggering dates). There is no dispute that Petitioner filed his habeas petition some sixteen years after his conviction became final in 2001. *See* 28 U.S.C. § 2244(d)(1)(A) (providing that one-year limitation period begins to run upon conclusion of direct review). Consequently, the petition is barred as untimely absent an applicable exception. Petitioner argues he is entitled to review of the merits of his petition because he is actually innocent of the crimes of conviction.[1]

---

[1] The AEDPA statute of limitations is not jurisdictional and is subject to tolling. *Holland v. Florida*, 560 U.S. 631, 645 (2010). However, the issue of whether either statutory or equitable tolling based on newly discovered evidence is applicable is not a question before the Court. *See, e.g.,* 28 U.S.C. § 2241(d)(1)(D) (providing one-year limitations period runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through

9

Actual innocence, if proved, serves as a gateway through which a petitioner may obtain review of his otherwise barred or untimely claims of constitutional violation. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006). In this context, "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citation and internal quotation marks omitted). Invocation of this exception requires the claim of innocence to be credible. *Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012) (citing *Souter v. Jones,* 395 F.3d 577, 601 (6th Cir. 2005)). To be credible, a claim of actual innocence must be supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

To establish a claim of actual innocence, Petitioner bears the burden of demonstrating that it is more likely than not that no reasonable juror would have convicted him in light of new evidence. *McQuiggin*, 569 U.S. at 386; *Schlup*, 513 U.S. at 327. When evaluating whether a petitioner has met this burden, the court assesses all reliable evidence of guilt or innocence, even evidence previously excluded or inadmissible under the rules of evidence at trial. *Schlup*, 513 U.S. at 327–28. The court's inquiry is not to make an independent determination as to the likelihood of a petitioner's guilt, but rather, to "to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id*. at 329.

---

the exercise of due diligence"); *Holland*, 560 U.S. at 649 (finding equitable tolling of statute of limitations is available only if petitioner establishes a diligent pursuit of rights and "that some extraordinary circumstance stood in his way and prevented timely filing") (internal quotation marks omitted); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (noting actual innocence is an "exception" to § 2241(d)(1), not an extension of the one-year deadline); *see also Reeves v. Fayette SCI*, 897 F.3d 154, 160 n.5 (3rd Cir. 2018). Regardless, to the extent the issue could be considered properly before the Court, Petitioner has failed to argue — much less demonstrate — the requisite diligence in discovering the factual basis of the 2010, 2011, and 2012 affidavits to warrant equitable or statutory tolling.

10

Any delay or lack of diligence in Petitioner's pursuit of his claim of actual innocence is not an absolute bar to an actual-innocence claim, but timing is a relevant factor in evaluating the reliability of the proof of innocence. *McQuiggin*, 569 U.S. at 399; *Schlup*, 513 U.S. at 332 (holding court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of . . . evidence [of actual innocence]"). Moreover, the Supreme Court has counseled "that the actual innocence exception should remain rare and only be applied in the extraordinary case." *Souter*, 395 F.3d at 590 (citation and internal quotation marks omitted). This standard is only met in cases where "a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin*, 569 U.S. at 401 (citation and internal quotation marks omitted).

### IV. DISCUSSION

#### A. Credibility of New Evidence

##### 1. "Newness" of Evidence

In determining whether Petitioner's claim of actual innocence is credible, the Court first considers whether the claim is founded on new evidence. Petitioner's trial occurred in May 1998 [*See, e.g.,* Doc. 6-1 at 2]. The affidavits presented to the coram nobis court were executed between September 2010 and April 2012 [Doc. 2-1 at 3–6].

Respondent questions whether the affidavits are "new," because "the testimony of all three affiants arguably existed at the time of trial" [Doc. 31 at 5]. Moreover, Respondent notes the assertion in Turner's affidavit, *i.e.* that Petitioner was not present in Kirk's Market when the shooting occurred, was available and presented at trial through multiple witnesses. However, the Court declines to adopt this argument and finds that the evidence is "new" under governing standards, as it was not presented to the factfinder at trial. *Schlup*, 513 U.S. at 836-37; *Cleveland*,

11

Case 3:18-cv-00330-CLC-HBG   Document 35   Filed 04/29/21   Page 11 of 18   PageID #: 1588

693 F.3d at 633 (noting Sixth Circuit has not decided whether "new" evidence under *Schlup* is only newly discovered evidence not available at the time of trial or includes evidence not presented to trier of fact, but that its opinions "suggest[] that this Circuit considers 'newly presented' evidence sufficient").

### 2. Reliability of Evidence

This leads the Court to an assessment of the reliability of the new evidence. The coram nobis court found the testimony of Boatwright and Hardin, which was an elaboration of the facts set forth in their respective affidavits, was not credible [Doc. 6-15 at 62]. The court found Turner's testimony to be credible but insufficient to meet the test that it "might have" changed the outcome of the trial [*Id*. at 62–63]. On appeal, the TCCA affirmed. *Lowery*, 2017 WL 3078313, at *6.

Habeas courts generally defer to trial court credibility findings, as the trial court is in the best position to determine witness credibility. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (holding that § 2254 does not give habeas courts "license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them"); *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005) (holding trial court's credibility finding may be overturned where evidence on the issue "is too powerful to conclude anything" other than the unreasonableness of the trial court's finding); *Schlup*, 513 U.S. at 330 (noting that while court may have to assess credibility of witnesses under gateway standard, "the assessment of the credibility of witnesses is generally beyond the scope of review"). Because the coram nobis court made credibility determinations in this case based on the new evidence, this Court defers to those findings where they are supported by the record.

#### a. Recantation Affidavits – Boatwright and Hardin

Courts typically view recantation testimony with great suspicion. *See, e.g., United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001) (noting that "affidavits by witnesses recanting their

12

trial testimony are to be looked upon with extreme suspicion") (internal quotation marks omitted). Here, the deceased victim was a cousin to Boatwright and a friend to Hardin, and a reasonable juror could conclude that Boatwright and Hardin provided accurate information to police after the incident to help find the gunman. Moreover, Boatwright himself was a victim of the shooting and had a stake in wanting the gunman caught. A reasonable juror could, therefore, find that these witnesses gave accurate testimony at trial. Conversely, without consideration of other factors, these same circumstances could also lead a reasonable juror to conclude that these witnesses had no improper motive to come forward and recant their testimonies years later. Upon consideration of additional aspects of the recantations, however, the Court finds indications that they are unreliable.

First, Boatwright and Hardin executed their affidavits recanting their identification of Petitioner as the shooter in 2012 and 2010, respectively [*See* Doc. 2-1 at 53, 55]. Hardin's affidavit is dated September 16, 2010, approximately a year before Petitioner filed for coram nobis relief on September 14, 2011 [Doc. 6-11 at 713–15]. Boatwright's affidavit was not produced until April 5, 2012, after there was a remand in the coram nobis proceedings [Doc. 2-1 at 55]. Petitioner has not adequately accounted for the decade-plus delay in procuring the affidavits nor in presenting them to a court, which undermines their reliability. *Freeman v. Trombley*, 483 F. App'x 51, 61–64 (6th Cir. 2012) (finding that recantation evidence presented ten years after the witness first testified under oath was insufficient to support gateway actual-innocence claim where there was no explanation for the significant delay). A reasonable juror could easily find Hardin and Boatwright's identification of Petitioner as the shooter at trial more credible than their recantations, as the identifications were made within hours after the incident and thus might have been seen as more reliable than the affidavits prepared many years after the incident.

Further, the timing of the affidavits is suspect. *See McQuiggin*, 569 U.S. at 399 (noting that the timing of newly discovered evidence of innocence is relevant to its reliability). These

13

affidavits were procured by Boatwright and Hardin after each were incarcerated on lengthy state-court sentences and after they were (at least temporarily) housed with Petitioner in MCCX. A reasonable juror could conclude that Boatwright and Hardin, concerned about being labeled as snitches after being housed with or near Petitioner, gave true testimony at trial and false testimony in their recantations.

Moreover, while Hardin claims he did not know Petitioner was not the shooter until he saw him up "close" at MCCX, he still did not initiate the recantation of his trial testimony. Hardin did not prepare his own recantation affidavit; it was prepared by an inmate at Petitioner's request. A reasonable juror could conclude that Hardin's lack of initiative in taking steps to exonerate Petitioner renders his recantation false and his trial testimony true. The record is devoid of the circumstances of Boatwright's recantation other than his statement that he decided to "come forward" and "do the right thing" in 2012 because it was weighing on his conscience [Doc. 6-16 at 13]. A reasonable juror could question, however, why Boatwright and Hardin did not come forward earlier. These facts would make it more difficult for a reasonable juror to find the affidavits reliable. *See Turner v. Romanowski*, 409 F. App'x 922, 930 (6th Cir. 2011) ("[A] reasonable juror would find it difficult to find [the witness's recantation] affidavit credible because he is lying now or he was lying then.").

The decision rejecting the recantation evidence is, therefore, supported by the record. Further, the Court finds that the timing and circumstances surrounding the recantation affidavits undermine their reliability and that a reasonable juror could find their trial testimony more credible than their recantations. Accordingly, the Court finds Hardin's and Boatwright's affidavits do not constitute credible evidence under *Schlup*.

### b. Loretta Turner

Conversely, the coram nobis court found Loretta Turner to be credible. Because no other evidence undermines her credibility, the Court finds that Turner's affidavit and coram nobis testimony constitutes credible new evidence.

### B. Totality of Evidence

Now the Court views the new evidence in the full context of the testimony offered at trial to determine whether Petitioner has met his burden of demonstrating "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *McQuiggin*, 569 U.S. at 386 (citing *Schlup*, 513 U.S. at 327).

The Court has concluded that Boatwright and Hardin's recantations do not constitute credible new evidence, and each testified at Petitioner's trial that Petitioner was the gunman at Kirk's Market on the day of the shooting. Officer George testified that Petitioner had made a robbery report at around 3:10 a.m. on the day of the shooting [Doc. 6-1 at 33–34]. Bowman testified that at around 6:30 that same morning, Petitioner got into Bowman's car at Kirk's Market and stated his belief that Boatwright and Hartsell were involved in robbing him [Doc. 6-1 at 91–106]. Petitioner was then identified by Bowman, Boatwright, and Hardin from a photo lineup prepared by Detective Ridenour, who stated that Boatwright identified the shooter as "J.B." [Doc. 6-2 at 59–61]. Therefore, Bowman, George, and Ridenour offered testimony providing context to Respondent's theory of the case that could allow a reasonable juror to conclude that Petitioner was the gunman at Kirk's Market on October 8, 1996, even considering the recantation evidence.

This brings the Court to the new evidence provided by Loretta Turner. Although the jury rejected Petitioner's proof that he was not present at Kirk's Market at the time of the shooting, that testimony came through witnesses with whom Petitioner had some sort of relationship. In fact, three of the witnesses — Fred Lowery, Walter Lowery, and Jay Harris — were related to Petitioner

15

[Doc. 6-2 at 4, 25, 40]. Defense witness Greg Moore was friends with Fred Lowery and was also present, along with Harris and Fred Lowery, when the crime occurred [*Id*. at 30–35]. Therefore, a reasonable juror could find these witnesses less credible than Loretta Turner, a seemingly unbiased witness who was herself partially subjected to the violence at Kirk's Market that day. *House*, 547 U.S. at 552 (finding evidence from witnesses "with no evident motive to lie" more probative than evidence from "friends or relations of the accused"). Additionally, Turner's testimony would have supported the trial testimony of defense witness Tamera McMillan, the neighbor who stated Petitioner was at her home at the time of the shooting.

However, Turner also testified that she ducked behind a solid wooden counter as soon as the shooting started, and that she did not see the shooting or the gunman [Doc. 6-16 at 66, 72]. The trial testimony and coram nobis testimony established that Hartsell was shot in the parking lot and Boatwright was shot either outside the door of the store or just as he was entering the door [*See id*. at 72–73]. None of the proof of Petitioner's guilt relied on a finding that Petitioner was actually in the store prior to the shooting.

Upon review of all of the available evidence, the Court finds it possible that a reasonable juror might view the recantation evidence and the seemingly unbiased evidence provided by Loretta Turner and harbor a reasonable doubt that Petitioner committed the shootings. However, that is not the standard. Rather, when considering Petitioner's new evidence alongside the evidence of guilt, the Court finds Petitioner has failed to demonstrate it is more likely than not that *no* reasonable juror would convict him in light of the new evidence. *McQuiggin*, 569 U.S. at 399; *Schlup*, 513 U.S. at 327. Accordingly, Petitioner has not established actual innocence as a gateway to bypass the statute of limitations, and his petition is untimely.

C.  **Actual Innocence**

Petitioner has also raised several freestanding claims of actual innocence [*See* Doc. 2]. However, the Court has addressed Petitioner's gateway claim of innocence and found it lacking. Therefore, Petitioner cannot satisfy the extremely high threshold showing of actual innocence that would be required to establish a freestanding claim. *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (finding threshold showing for freestanding claim of innocence "would necessarily be extraordinarily high"); *see also House*, 547 U.S. at 555 (noting that the Supreme Court's decisions imply "at the least that *Herrera* requires more convincing proof of innocence than *Schlup*"). Moreover, such a claim has never been recognized by the Supreme Court. *McQuiggin*, 569 U.S. at 392 ("We have not resolved whether a prisoner may be entitled to habeas relief on a freestanding claim of actual innocence."). Accordingly, Petitioner's freestanding claims of actual innocence also fail to offer Petitioner a basis for relief.

V.  **CERTIFICATE OF APPEALABILITY**

According to Rule 11 of the Rules Governing § 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability ("COA") upon entry of "a final order adverse to the applicant." A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."

*Slack*, 529 U.S. at 484. Applying this standard, the Court finds that Petitioner is entitled to a COA on his rejected gateway claim of actual innocence.

## VI. CONCLUSION

For the reasons set forth above, the Court finds that the instant petition is untimely, and that Petitioner has not established actual innocence to bypass the statute of limitation. Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A COA from this decision will be **GRANTED** on the sole issue of whether the actual-innocence exception is applicable to Petitioner's untimely habeas petition. A COA will be **DENIED** as to all other claims.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

/s/
**CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE**